Lauro Homer CHAPA & Raquel Lopez Chapa, Individually and as Next Friend of Luis Ricardo Chapa, a Minor

v.

The Honorable Ricardo H. GARCIA, Judge.

No. C–9639.

Supreme Court of Texas.

Dec. 31, 1992.

Rehearing Overruled April 7, 1993.

Abelardo Garza, San Diego, TX, Kevin Dubose, Houston, Richard Miller, Springfield, MO, Steven Naumann, Robert A. Chaffin, Houston, for appellant.

David J. Demars, Corpus Christi, William W. Kilgarlin, Austin, J.A. Canales, Steve T. Hastings, Corpus Christi, Paul E. Stallings, Houston, Sharmyn K. Lumsden, Austin, Russell Manning, Corpus Chirsti, B. Lee Ware, Eileen F. O'Neill, Frank W. Mitchell, Houston, for appellee.

## OPINION

GAMMAGE, Justice.

In this mandamus proceeding, we consider whether the trial court abused its discretion in a products liability action by denying Relators discovery of documents asserted to contain alternative design information. Because at least some of the documents sought are of a type indistinguishable from those for which production was ordered in *Jampole v. Touchy*, 673 S.W.2d 569 (Tex.1984, orig. proceeding), we conditionally grant the writ of mandamus.

In December 1984, Luis Chapa was injured when a Remington Model 700 bolt-action rifle discharged during loading. A products liability action ensued, in which Relators claimed that the injuries were attributable to design defects in the rifle's fire control system.

Remington filed a motion for protective order and tendered a supporting affidavit from its Technical Manager, sealed with the documents for *in camera* inspection.[1] The trial court determined that disclosure of this information was not mandated since these documents "contain only research ideas and concepts and do not address alternative designs for the Model 700 or any other past or existing product."[2] From

---

1. *See Remington v. Canales*, 837 S.W.2d 624 (Tex.1992, orig. proceeding).

2. In our previous unpublished order of June 27, 1990, concerning another aspect of the trial court's ruling on this matter, we advised it to

our consideration of applicable law and *in camera* review, we conclude that the trial court abused its discretion at least as to some of these documents.

The question presented today is whether our ruling in *Jampole* can be avoided by placing documents in a file marked "NBAR." Discovery is designed "to allow the litigants to obtain the fullest knowledge of the facts and issues prior to trial." *Axelson, Inc. v. McIlhany*, 798 S.W.2d 550, 553 (Tex.1990, orig. proceeding). A review of the documents submitted *in camera* to this court makes evident that some of the documents contained in the NBAR file concern investigation into design improvements for the Model 700, the very model that alleged to have injured Luis Chapa. Moreover, as one court has recently concluded in reviewing what is apparently the same information, "A few documents are copies of magazine articles, already part of the public domain." *Hartman v. Remington Arms Co.*, 143 F.R.D. 673 (W.D.Mo.1992).

The trial court's "clear failure ... to analyze or apply the law correctly" constitutes an abuse of discretion and is subject to correction by extraordinary writ. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992, orig. proceeding). Further, because denial of these discovery materials severely vitiates Relators' ability to present a viable claim at trial, remedy by appeal is inadequate. *Id.* at 843.

We are confident that Judge Garcia, after vacating his order of July 23, 1990, will provide to Relators all of the *in camera* documents that this court has identified for immediate release and, as to the remainder, will perform a careful and thorough review, possibly with the assistance of an independent special master with firearms expertise, and provide to the Relators all documents of a similar nature. The writ of mandamus will issue only if the trial court does not so vacate its order.

DOGGETT, J., concurs with opinion.

*See Jampole v. Touchy*, 673 S.W.2d 569 (Tex. 1984) (trial court's denial of discovery of al-

HECHT, J., dissents with opinion in which PHILLIPS, C.J., and GONZALEZ and CORNYN, JJ., joined.

DOGGETT, Justice, concurring.

I join in the court's opinion and judgment, which correctly conclude that the trial court abused its discretion in refusing to order production of alternative design information clearly discoverable under *Jampole v. Touchy*, 673 S.W.2d 569 (Tex. 1984, orig. proceeding). I cannot agree with the dissenting justices, who would endanger the safety of Texas gun owners and their associates by granting absolute protection for these materials despite their relevance and importance in establishing Remington's knowledge that defects in the Model 700 Rifle caused it to discharge without pulling the trigger. Unable to prevail in this effort, the dissent completely misrepresents not only this concurrence but, more importantly, the clear command of the court's holding that in addition to those documents "identified for immediate release[, the trial court should] perform a thorough and careful review, possibly with the assistance of an independent special master with firearms expertise, and provide to the Relators all documents of a similar nature." Majority Opinion at 668.

I.

In December 1984, Luis Chapa was shot when a Remington Model 700 bolt-action rifle discharged during loading. In the ensuing products liability action, he claimed that the injury was attributable to design defects in the rifle's fire-control system. Chapa repeatedly sought to determine any Remington attempt to prevent misfiring through improvements in the design of this system. Among this discovery were requests for production of documents "relating to any design studies concerning alternate designs for the safety system or trigger assembly mechanism" and those "regarding the replacement of any of the fire control system with a different design" for certain identified rifle models.

ternative designs utilized in non-identical products constitutes an abuse of discretion).

The only discovery produced, however, was limited both as to scope—research directed specifically to improvement of the Model 700—and as to time—only through 1981. After Remington mistakenly provided minutes of its Firearms Business Team dated May 31, 1985 describing ongoing research into a New Bolt Action Rifle (NBAR) as a *"replacement for the Model 700,"* Chapa demanded production of materials relating to the NBAR program under previous discovery requests for alternative design and replacement information. When Remington refused, Chapa served notices of depositions accompanied by subpoenas duces tecum requesting specific NBAR materials and filed a motion to compel production based on earlier requests together with a motion for sanctions for discovery abuse.

At the first of five hearings concerning these matters, the trial court ordered production of the NBAR documents for an *in camera* inspection. Chapa subsequently filed a second motion to compel discovery of alternative design documents, including NBAR, and Remington filed a motion for protective order with respect to the deposition notices. After William H. Coleman II, Remington's Technical Manager responsible for NBAR, refused to answer deposition questions on November 1, 1989 concerning the scope and objectives of the NBAR program, Chapa sought an order compelling a response to questions "directed to his knowledge of alternative designs for the Model 700 and any replacement designs."

Within a few days of his refusing to be deposed about NBAR, Coleman described the program in a secret sworn statement,[1]

which Remington refused to provide to Chapa. This affidavit, described in Remington's motion for protective order[2] as containing "technical information concerning the NBAR program [that] includes a comparison, to the extent possible, of NBAR design concepts to the Model 700," was sealed and tendered together with the NBAR documents for *in camera* inspection.[3] Prior to the trial court's ruling, Chapa was permitted neither to examine this affidavit nor to depose Coleman regarding its contents or the relevancy of the NBAR information. Although discussed by generalized groupings in this *ex parte* affidavit, the documents transmitted for *in camera* review in a file cabinet contained no index of any kind for the trial court or Chapa.[4] At a third hearing on the NBAR information on November 21, 1989, the trial court made no ruling.

In January 1990, after the court directed Coleman to submit to a deposition regarding "replacement" designs, Remington sought an order excluding any queries regarding NBAR pending the *in camera* inspection. Without a hearing, the trial court promptly issued an order of clarification adopting Remington's suggested language. At a fourth hearing on February 5, the court explained this order as entitling Chapa to information "[a]s long as it's relating to the 700.... If it's not to the 700 you are not entitled to it."

At the fifth and final hearing on February 27, the trial court affirmed the limitation of questions that could be posed to Coleman by overruling Chapa's motion to compel, but stated that alternative design and replacement information for the Model 700 was discoverable. On March 15, ques-

---

1. This "Affidavit of William H. Coleman II" is incorporated in full as Appendix A.

2. Defendant's Motion for Protective Order and Response to Plaintiffs' Motion to Compel and Motion for Sanctions (November 16, 1989) ("Motion for Protective Order") at 35.

3. A review of the affidavit indicates that this secret filing represented little more than a clever litigation tactic to take advantage of an adversary by getting the last unrebutted word with the trial judge. *See Remington Arms Co. v. Canales,* 837 S.W.2d 624 (Tex.1992) (unanimous-

ly condemning the use of the identical *ex parte* filing).

4. The manner in which these documents were provided has substantially impaired appellate review. They are not numbered by page, nor organized in a readily comprehensible way; handwritten notes of unidentified authors are numerous; many documents are undated, their origin within the company's filing system unknown. It would appear that Remington sought to impede rather than to encourage *in camera* inspection.

tioning these rulings "that no discovery would be permitted on the subject of alternative or replacement design," Chapa asked that we mandate discoverability of the NBAR information and vacate the trial court's "decisions" concerning NBAR. Because the trial court did not issue a written order concerning this multiplicity of oral rulings, some of which apparently authorized discovery of the NBAR information and some of which did not, we directed the trial court on June 27, 1990 "to reduce to writing" the decision on pending motions and cited *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984, orig. proceeding), in advising that "denial of discovery of alternative designs used in non-identical products constitutes an abuse of discretion."[5]

The trial court's subsequent written order of July 23, 1990 denied discovery, concluding that the NBAR materials did not include alternative design information.

## II.

While objecting to the failure of the majority to address a trade secret claim, the dissenting justices undertake no examination into whether Remington met its burden of proof in establishing a right to protection. Neither the evidence nor the documents tendered by Remington establish such a right.

At a time of rapid technological change, genuine trade secrets certainly deserve the continued protection that our Texas courts have traditionally afforded. In *Hyde Corp. v. Huffines,* 314 S.W.2d 763, 776 (Tex. 1958), we relied upon the Restatement of Torts § 757, comment b, in defining a trade secret as "any formula, pattern, device or compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it." 314

S.W.2d at 776. Like any other privilege, the burden of establishing the true existence of a trade secret and its value to the owner remains on the claimant, who must show:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement of Torts § 757, comment b, at 6.

As these factors indicate, far more is necessary than simply showing that the information was developed in the course of trade or commerce. The showing required is substantial though certainly not insurmountable. Our limitation on the scope of trade secrets and allocation of the burden of proof to the privilege holder arise not from a lack of respect for their economic importance but from a realization that secrecy burdens the search for truth. In accord with the Restatement and our prior writing, unless the veil of secrecy is constrained, the very integrity of our system of justice is endangered. Our significant concern with this very real threat to truth has been firmly incorporated into our rules prohibiting protection of trade secrets that "tend to conceal fraud or otherwise work injustice." Tex.R.Civ.Evid. 507. To ensure that secrecy does not become subversion, the trade secret privilege is only "sparingly permitted." *Lehnhard v. Moore,* 401 S.W.2d 232, 235 (Tex.1966) (quoting Wigmore). Further, the privilege is a qualified

---

**5.** The order, dated June 27, 1990, instructed the trial court:

to reduce to writing his oral ruling on pending motions of Plaintiffs and Defendants ... in connection with his in camera inspection of documents of Remington Arms Co. relating to its New Bolt Action Rifle program ("NBAR"). *See Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984) (trial court's denial of discovery of alternative designs utilized in

non-identical products constitutes an abuse of discretion).

Justice Hecht oddly reserves his criticism of this order for more than two years after its issuance. He would further urge an interpretation of our appellate rules to bar mandamus relief when no written order is produced, Dissenting opinion at 679, even when the trial court refuses to issue one.

one; the protection cannot be absolute: secrecy cannot "avail against demand for the truth in a court of justice." *Id.*

Remington did not meet this burden. Its evidence was limited to a single secret affidavit which, as a matter of law, cannot constitute supportive evidence. While this case was under submission, the court considered this identical affidavit in another proceeding involving the same counsel and unanimously condemned its *ex parte* filing. *Remington v. Canales,* 837 S.W.2d 624, 626 (Tex.1992). Since such submission is improper, we held that it "cannot provide the evidence necessary to carry Remington's burden of proof" as to claimed privileges. *Id.* at 626. The only other evidence offered by Remington to support its claim of privilege are the documents themselves, of which I have made a thorough page by page examination.

The documents themselves, standing alone, do not satisfy the six-part Restatement test—nothing is shown as to knowledge outside the company, the measures taken to guard the secrecy of the information, the value of the information, the difficulty of duplication of the information by others or the amount of effort or money expended in developing it. Moreover, many of the documents do not reflect they are confidential or proprietary; many do not indicate by whom they were prepared or received. Some of them are public information. Included within the claimed secret NBAR materials are copies of numerous public patents, advertising and informational brochures prepared by parts suppliers and manufacturers, and magazine articles concerning topics such as new rifles of competing manufacturers, gun experts and game hunters. Several relate *only* to the Model 700, but have been placed within the NBAR files either by mistake or intentionally to avoid their production. As one court has recently concluded in reviewing what is apparently the same information:

> A few documents are copies of magazine articles, already part of the public domain.... A large number of the NBAR documents include significant references to the Model 700, as well as to similar

models of defendant's products. Under Remington's assertion, any document placed in these files is privileged as a trade secret because it is part of the "compilation of information." Taking defendant's argument to the "nth" degree would encourage defendants to merge research on existing/old products with development of new designs in order to avail themselves of the trade secret privilege for all documents placed in the on-going research files. The documents do not lose their relevance to plaintiff's claims simply by their placement in the NBAR files.

· · · · ·

Two examples illustrate the overbreadth of defendant's contention that all the documents are entitled to absolute protection as NBAR trade secrets. The first example is an undated note from Ed Herring on a photocopied page from a magazine or book ... The note specifically addresses incorporating an alternative component in the Model 700 rifle.... The second example appears to be a customer letter, from Bob Hegel, about the Model 700 written on February 9, 1984.... Mr. Hegel is a gun writer ... [and] this letter discusses only the Model 700....

*Hartman v. Remington Arms Co.,* 143 F.R.D. 673 (W.D.Mo.1992). Clearly all of the documents do not contain trade secret information; indiscriminately extending protection to everything Remington submitted would mock the law of privileges and invert the proper placement of the burden of proof.

Luis Chapa clearly established the relevance of and his need for the documents, by offering evidence demonstrating that the NBAR program had as its goal improvement of the defective fire control on the Model 700 and that Chapa faced a significant time gap in the record as to Remington's *knowledge* of the defect.[6] Included in Chapa's showing was:

● a 1985 Remington memorandum describing the NBAR program as one to design a "replacement for the Model 700"

---

6. The fact that the NBAR documents were gen-

erated after the rifle that injured Luis Chapa

● another Remington memorandum declaring that an improved fire control be installed in the Model 700 no later than October 1982 "to put us in a more secure position with respect to product liability"

● a memorandum evidencing an increase of $130,000, in early 1981, in the research budget for development of an improved Model 700 fire control

● proof of the abrupt discontinuation of further research into the fire-control system of the Model 700 after December 1981 coincident in time with the commencement of the NBAR program

● deposition testimony that models of new, improved fire controls had been designed and assembled as part of NBAR, that prototypes had been built and tested, and that the NBAR fire controls could be retrofitted to the Model 700.

● Remington's admission that the fire control alternatives under consideration in the NBAR program and those it claims were geared solely to the Model 700 "attempt to execute the same *idea* (simultaneous blocking of the sear and trigger)" [7]

● Remington's concession that the fire-control system research adopted the name "NBAR" in "late 1980 or 1981," about the time of the substantial increase in research funds for the Model 700 fire-control system.

● Remington's admission that "NBAR components which are or have been under consideration include a ... different fire control."

● Statements by Remington that NBAR information has relevance to the relative safety of its models compared to its competitors and the possible need for warnings:

"Also included within these documents are Remington's assessment of the designs executed by other manufacturers."

was manufactured precludes neither their discoverability nor admissibility at trial. Rule 407(a), Tex.R.Civ.Evid., provides that subsequent remedial measures *are* admissible "in products liability cases based on strict liability." *See also* 2 J. Hadley Edgar, Jr. & James B. Sales, Texas Torts and Remedies § 41.03[3][d][i] (1990) (emphasis supplied) ("Evidence of actions that a defendant takes *after a product*

Presented with similar evidence, a federal district court concluded as to these same documents that:

*Plaintiffs have also demonstrated the need for these documents.* Without the NBAR documents, plaintiff is left with a significant time gap in the evidence concerning the information known to the defendant....

*Hartman v. Remington Arms Co.,* 143 F.R.D. at 675–76.

Moreover, the documents themselves demonstrate relevance and need. Many of them will provide evidence of great significance, perhaps the only evidence, as to Remington's knowledge of defects and of its ability to implement safer, alternative designs. These materials suggest that Remington's on-going research concerns were precisely those that are at issue in this litigation—whether it knew of problems with the safety in the Model 700 and whether improvement was feasible. Included among them are research reports and memoranda showing that new safety assemblies and fire controls had been tested in the Model 700 on several occasions before Chapa's injury; memoranda recommending improvements to the safety in the Model 700, including multiple blocking of the sear and trigger; competitive review of competing rifles' fire controls and safeties; and documents reflecting significant concerns regarding the Model 700 by Remington personnel. Luis Chapa should have an opportunity to examine these documents and to depose those Remington employees involved in these events relating to the Model 700. As another court correctly concluded in reviewing these documents:

*the evidence also provides the only source of admissions and information on defendant's knowledge* of alleged Model 700 defects, testing done on Model 700 and alternative components.

*causes damage or injury* and that are intended to reduce the likelihood of a recurrence of such an event is admissible in strict liability actions.").

7. Motion for Protective Order at 13 (emphasis in original).

*Hartman v. Remington Arms Co.,* 143 F.R.D. at 676 (emphasis supplied). That court ordered disclosure of most of the documents we consider today. Contrary to the dissent's assertion, far more than "three or four" of these documents were improperly withheld.

Luis Chapa could not have made a more compelling showing. This court has recognized the considerable hardship associated with proving need for documents the contents of which a party has never seen and cannot possibly know. In *State v. Lowry,* 802 S.W.2d 669, 673 (Tex.1991), we unanimously held that several insurance companies had sufficiently demonstrated the need for documents encompassed by a statutorily qualified privilege by showing that this information was obtained in an investigation of their conduct and could be useful to them. That writing properly recognized that:

> It is difficult for the insurers to make a more particularized showing of need for these documents, the contents of which are unknown to them. We determine that a sufficient showing was made to establish substantial need.

This preference for openness should not be limited to only those circumstances benefitting insurance companies.

We have consistently recognized the importance of permitting full discovery combined with narrowly drawn protective orders when necessary to protect genuine trade secrets.[8] *See Garcia v. Peeples,* 734 S.W.2d 343, 346 (Tex.1987).[9] Here, Luis Chapa made clear his willingness to be bound by a lengthy protective order that was already in place to preserve any proprietary rights of Remington in information provided during discovery. Based on the same facts presented to the trial court in this case, one court has already concluded that a protective order would adequately safeguard Remington's proprietary interests with respect to virtually all of the NBAR documents. *Hartman,* 143 F.R.D. at 678.

The dissenters would permit an absolute privilege for all trade secrets tantamount to a legally sanctioned license for unfair competition or fraud, and would sanction the continued manufacture of dangerous products by the party asserting the privilege, by depriving the opposing litigant of the necessary evidence to prove its case. They would assure Remington the right to conceal evidence concerning the potentially dangerous features of its fire control and safety to the detriment not just of Luis Chapa but many other gun owners as well. Justice is not served by protection of information that precludes fair resolution of a lawsuit.

### III.

Nor can mandamus relief be denied here on grounds of administrative convenience, on the claim that this court does not have the time or the resources to review materials submitted for *in camera* inspection. This would contravene our recognized practice, reaffirmed only two weeks ago without objection:

> When, as here, the documents themselves are the only evidence offered to establish an exception to a privilege, it is proper that the reviewing court review the documents to determine if they clearly support the exception.

*Granada Corp. v. First Court of Appeals,* 844 S.W.2d 223, 225 (Tex.1992, orig. proceeding). *Accord Barnes v. Whittington,* 751 S.W.2d 493, 495 (Tex.1988, orig. pro-

---

**8.** While discoverability by the parties is often confused with disclosability to the public, discoverability and disclosability issues must be resolved *separately.* Remington argues that discovery will hamper its ability to prevent the documents' public disclosure. Our order transferring the documents to the trial court in no way prevents Remington from seeking temporary or continuing relief from public dissemination pursuant to Tex.R.Civ.P. 76a & 166b(5). Although a protective order was already obtained, compliance with these provisions is required because the records in question constitute those from a pending case "exchanged after the effective date [of Rule 76a]." Tex.R.Civ.P. 76a(9).

**9.** The burden is on the movant to prove that the failure to issue a protective order will result in a "particular, articulated and demonstrable injury, as opposed to conclusory allegations." *Id.* at 345; *see also Masinga v. Whittington,* 792 S.W.2d 940, 940 (Tex.1990, orig. proceeding).

ceeding); *Weisel Enterprises, Inc. v. Curry*, 718 S.W.2d 56, 58 (Tex.1986, orig. proceeding); *Jordan v. Fourth Court of Appeals*, 701 S.W.2d 644 (Tex.1985). The dissenting justices disparage this effort as "micromanag[ing] discovery." Dissenting opinion at 680. They fail to recognize that an appellate court's refusal to consider *in camera* submissions would grant to the trial court unbridled discretion in determining privilege. No matter how egregious the denial of discovery, how impossible the claim of privilege, or whether or not the trial judge ever even examined the tendered materials, no abuse of discretion could be shown if the trial court simply states that an *in camera* review has been performed.

Our obligation to ensure that the law of evidentiary privilege is correctly applied cannot be dependent upon the number of documents one seeking to avoid discovery submits for an *in camera* inspection. A contrary approach would only encourage more unwarranted resistance to discovery—an incentive to ship a boxcar of documents when only a box would suffice. Further, whether the error affects one document or one hundred, one percent or fifty percent, when the wrongful grant or denial of discovery substantially affects a party's rights, mandamus is appropriate. This court's mandamus jurisdiction protecting against abuse of discretion would be but a hollow promise if a different view were to prevail.

### IV.

Today's opinion appropriately recognizes that "denial of these discovery materials severely vitiates [Luis Chapa's] ability to present a viable claim at trial," Majority opinion at 668, thus meeting the standard set forth for mandamus relief in *Walker v. Packer*, 827 S.W.2d 833, 843 (Tex.1992, orig. proceeding). Although I believe the *Walker* constraints on issuance of mandamus when discovery is wrongfully denied are too onerous, *see id.* at 846 (Doggett, J., dissenting), I agree that Chapa has fully shown he lacks an adequate remedy by appeal.

The dissent would interpret *Walker* to ensure that mandamus could never issue when discovery is denied, unless the appli-

cant confesses that, without the materials sought, the trial court must and should direct a contrary verdict. Claiming that Luis Chapa has not shown his case will be vitiated without the NBAR documents, the dissenting justices rely exclusively on the fact that Chapa's counsel, in argument to this court, was unwilling to declare publicly that a jury finding of liability was impossible without the requested production. Dissenting opinion at 679.

Neither Chapa nor his counsel has seen these documents. Because we have reviewed them, we can readily ascertain their value in the underlying litigation. Relief should not be denied simply because a party is unwilling to admit defeat or cannot guess the true worth of what is hidden in a sealed file cabinet.

### V.

Just last year this court unanimously stated that:

> Affording parties full discovery promotes the fair resolution of disputes by the judiciary. This court has vigorously sought to ensure that lawsuits are "decided by what the facts reveal, not by what facts are concealed." Discovery is thus the linchpin in the search for truth. . . .

*State v. Lowry*, 802 S.W.2d at 671 (citations omitted). Today's decision ensures that this litigation will not be one of "gamesmanship and secrecy," *id.*, but instead will promote a fair resolution through revelation of the facts.

### APPENDIX A

#### CAUSE NO. 13,461

In the District Court of Duval County, Texas

229TH Judicial District

Lauro Homer Chapa and Raquel Lopez Chapa, Individually and as Next Friend of Luis Ricardo Chapa, a Minor

vs.

Remington Arms Company, et al.

#### AFFIDAVIT OF WILLIAM H. COLEMAN II

STATE OF NEW YORK

COUNTY OF HERKIMER

BEFORE ME, the undersigned authority, on this day personally appeared William H. Coleman II, who, after being fully identified to me and first being duly sworn according to law upon his oath, deposed and stated:

My name is William H. Coleman II. I am over eighteen (18) years of age, have never been convicted of a crime, and am fully competent to make this Affidavit. I have personal knowledge of the facts stated herein and all facts are true and correct.

I am the Technical Manager in charge of, among other things, the Research and Development Division of Remington Arms Company, Inc., and have personal knowledge of the following:

Since approximately 1980–81 Remington has been working on a proposed design for a new bolt action rifle (NBAR). That rifle has not, to date, been manufactured and is presently loosely scheduled in an undefined form for production in the next several years. The NBAR project has taken many forms, both conceptually and in drawing and prototype stages, from the standpoint of features and the marketing niche it is designed to fill. The design inputs for the NBAR project have come from a variety of sources including consumer research, marketing, individual design staff within Remington, evaluation of past designs and the present designs of competitors, as well as the collective expertise of the Remington personnel. At the present time, Remington does not intend to discontinue production of the Model 700 even if the NBAR is produced. The Model 700 remains one of Remington's most popular products and maintains a strong position within the centerfire bolt action rifle market.

Despite the strength of the Model 700 in the market, Remington has recognized that the market may demand a replacement or, an alternatively-featured bolt action centerfire rifle. Likewise, Remington has recognized that development of a new product requires significant lead time. During the natural course of new product development documents and other materials are created.

As is more fully detailed below, these documents as well as the concepts they embody must remain the confidential property of Remington.

Because NBAR remains a concept and not a rifle, the difference between NBAR and the Model 700 cannot fully be described. However, NBAR components which are or have been under consideration include a different receiver, different stock, different magazine and feeding system, different fire control, different extractor, different scope mounting system, different bolts, different barrels, different bolt latch designs, and numerous cosmetic alternatives, among other differences. The documents which are being produced for the *in camera* inspection reveal these design differences.

### TEST AND MEASUREMENT LAB REPORTS

Test and measurement lab reports are reports produced by the test and measurement section of Illinois Research Division which report the technical performance of firearms under test. Test lab reports may be written regarding changes in firearms currently produced (such as the inclusion of a new caliber) or regarding the evaluation of new features of designs under development. In addition to tests which are reflected in the reports the test lab also provides on-site testing services for the research department which may not be in written form.

The reports produced for *in camera* inspection reflect testing done on selected features that have been considered by the designers during the NBAR program. In some instances design features for a new model will be evaluated on a test firearm, one currently in production, on which the new feature has been placed. In addition, test documents may reflect comparisons between NBAR and current Remington designs or the design of its competitors.

Test lab reports that discuss features that have been built in prototype or designer models reveal features that have advanced past mere concepts. Disclosure of the ability to execute any design concept

would cost Remington the benefit of the time and expense expended in designing, producing and testing the concept. Likewise, test lab reports that report results less than fully successful would disclose design concepts that may not be fruitful to pursue and thereby offer our competition an advantage.

## PROJECT FEATURE/SPECIFICATION LISTS

Documents which may be categorized as project feature and specification lists are included for *in camera* inspection. These lists are formulated as the result of input from several sources which may include marketing, consumer research, design engineers and project management. The lists are subject to change as features are evaluated and the input from the various sources changes. Evaluation may include testing of components, cost estimates, changes in the market and consumer perceptions. Typically the lists are prepared in conjunction with meetings or communications such as design committee meetings which are also provided herein to the court. With respect to the NBAR program, the feature specification list has been dynamic rather than static, reflecting the on-going nature of the program, as well as the difficulty in establishing a concept which would be perceptibly better than the overwhelmingly popular Model 700. The lists may also reflect the relative priority of different design packages within the overall project at the time the list was generated.

Project featurization lists are highly proprietary because they reveal in a very stark format the plans for possible new products. Some of the lists of a proposed design package disclose the summary of numerous resources and the creative process relative to the market demand, how the design may evolve and the ability of Remington to execute practical designs to meet that demand. Disclosure of this material would not only reveal the specific features of the NBAR program and other programs unrelated to bolt action rifles, as they have evolved from the initial concepts, but also would clearly show Remington's competitors the manner of interaction within Remington which may lead to the design of new products. Examination of feature lists by competitors would allow them to capitalize on Remington's new product development efforts.

## TIME PROJECTIONS/WORK ASSIGNMENTS

Time projections and work assignments are documents that reflect the proposed development schedules for the NBAR project as well as other design programs. The time schedules indicate the period of time Remington anticipated at the time the schedule was created that it would take to complete various components or phases of the project, based upon current priorities and resources, which can change significantly during the year. The work assignments reflect the allocation of manpower Remington had assigned or anticipated assigning to the project. Because the NBAR program has remained developmental throughout its history, the documents reflect a continuum of target dates and assignments. These documents are highly sensitive, particularly those that are more current because they reveal Remington's intent to place new products in the market at a specific time. If this information were revealed to a competitor, it would permit the competitor to beat Remington into the market with a product design similar to Remington's, thereby depriving Remington of the benefit or research and developments efforts as well as its market strategy devoted to the timing of introduction of new products. Revealing Remington's intent through any documents could also significantly impair sales of current models through public knowledge of the impending sale of a new product. In addition, the documents reveal the resources available to Remington, the utilization of those resources in terms of priority, thereby placing other firearm manufacturers in an advantageous position.

## DRAWINGS, PRINTS, BLUEPRINTS

Drawings, prints and blueprints are documents that reveal the design engineers'

efforts to reduce the concepts to formal, engineering form. The nature of documents is such that they indicate calculations, very specific measurements and other technical data which is the result of a very intense effort on the part of the engineering staff. Apart from designer's models (which are a preliminary prototype), the drawings, prints and blueprints represent the most complete effort to design a new component or product.

Drawings, prints and blueprints are extremely sensitive, confidential and proprietary documents which disclose and reveal design efforts in minute detail. Disclosure of this category of document would give a literal road map to a competitor attempting to emulate or appropriate Remington's design efforts. Even designs that were rejected after the drawing stage reveal sensitive information because they indicate which alternatives Remington has evaluated. Remington would lose the benefit of its intensive efforts in producing the drawings if they were revealed to Remington's competitors.

## MONTHLY/QUARTERLY REPORTS

Monthly and quarterly reports have been prepared intermittently in the research division at Ilion since approximately 1982. Both reports indicate the projects that the research engineers are working on at the time the report is created as well as identifying the status of projects that have been slated for future work. The reports reveal the success or lack of success of proposed designs in order for the staff to keep abreast of design and research efforts and the individual efforts of the design staff.

Monthly and quarterly reports are sensitive, confidential and proprietary documents which disclose and reveal design efforts in chronological detail, thereby disclosing the day-by-day efforts of the research and design staff. The monthly and quarterly reports are deemed confidential at the time they are generated and are subject to limited distribution within Remington. Disclosure of this category of document would permit a competitor to eliminate efforts that may lead to less than successful results at Remington's expense. Remington would lose the benefit of its efforts to control the design progress if these categories of documents were revealed to Remington's competitors.

## DESIGN TEAM MEMORANDA, NBAR COMMITTEE MINUTES, BOLT ACTION COMPETITIVE REVIEW

Design team memoranda and NBAR committee minutes are documents among the engineers and design staff that discuss on a contemporary basis the progress on the NBAR design. Also included within these documents are Remington's assessment of the designs executed by other manufacturers. The court will note that these documents are not standard in form which reflects in part the varied emphasis on the project. A group of engineers met intermittently to discuss the NBAR project and the notes of those meetings are also provided herein. The design team memoranda also include cost estimates on various aspects of the NBAR program. These documents reflect Remington's actual and prospective ability to produce new designs. These documents may also reveal the status of other projects not related to bolt action centerfire rifles. The design team memoranda often include project featurization lists which are discussed at page three.

Design team memoranda and NBAR committee minutes are highly proprietary and confidential because they reveal the contemporary thought process of the Remington design and research staff. The cost analysis information would be very helpful to competitors in attempting to develop a rifle at a lower price. The memoranda often summarize the testing and evaluation documents which are discussed herein. Revealing these memoranda to the competitors of Remington would place the competitors at a decisive advantage at the expense of Remington.

## MARKETING/BUSINESS STRATEGY/CONSUMER RESEARCH

Marketing/business strategy and consumer research documents are all docu-

ments prepared in an attempt to assess Remington's current and future position in the bolt action centerfire rifle marketplace. The marketing/business strategy documents reflect Remington's perception of its present competitive position. Perhaps more significantly, they also reveal Remington's strategy to maintain or increase their competitive position. The consumer research documents are prepared in order to examine consumer perceptions of proposed designs. For instance, in an attempt to discover what cosmetic features are attractive to customers, Remington contracted with an outside consumer research group to conduct studies of alternate styling features. The studies involve face-to-face interaction with consumers at numerous locations across the country utilizing designer samples and employing sophisticated interview techniques. The results of the consumer research are then utilized in part in designing a new product.

Documents which reveal the business and marketing strategy of Remington and the consumer research are confidential and proprietary and should not be subject to discovery. Remington's future marketing strategy indicates in the very clear terms the measures that Remington may take to preserve or enhance its market position. If these plans are made known to Remington's competitors, Remington would lose the benefit of its efforts in this respect. They would place Remington at an extreme disadvantage in the bolt action centerfire rifle market place.

Remington would also be placed at a disadvantage with respect to the purchasers of Remington's present product line who may be apprehensive about having excess quantities of the older bolt action rifle line in their inventory. Additionally, if it became known that Remington will be introducing a new product or is scheduled to introduce a new product, it would immediately adversely impact sales at the retail level and, in turn, would impact Remington and the persons who maintain inventory of Remington products.

## MINUTES OF THE REMINGTON FIREARMS BUSINESS TEAM AND PRODUCT TEAM

Remington's Firearms Business Team was formed in 1984 as part of an effort to streamline and decentralize decision-making and to make decision-making more efficient and responsive. The Firearms Business Team has mainly dealt with economic issues related to firearms. The objective of the business team was to run the business to accomplish long-term goals while meeting short-term objectives by focusing on a strategic level. The Firearms Product Team has mainly been concerned with product development as it relates to firearms. The teams meet on a more or less regular basis and minutes of the meetings are generated and saved. Charts, schedules, and other items are sometimes attached to these minutes. The minutes are kept in a confidential manner within Remington and are available to Remington employees only on a need to know basis. These minutes reflect, among other things, research, development, testing, production, marketing, and profitability of the company's products.

The Firearms Business Team and Product Team have been responsible to oversee the NBAR program. The program has been a frequent subject of the teams' meetings. The Firearms Business Team and Product Team minutes contain information regarding the planning and scheduling of NBAR research and development and marketing. The minutes reflect the relative priority given at various times by the company to NBAR and other research and development projects. Perhaps most important, the minutes reveal the features and combinations of features which Remington has believed to be desirable for the new product. In summary, these documents reveal Remington's thinking at the policy level regarding the NBAR program.

As supervisor of the research and development section, I am familiar with the security measures undertaken by Remington to safeguard the confidentiality of documents and materials generated in the design of a new product. First, all such

documents are maintained in an area of the Ilion facility that is not accessible by the general public. No person who is not a Remington employee is admitted into the research department without official clearance. Each person admitted is provided an escort. Second, many of the documents which are provided herein for *in camera* inspection are subject to very limited circulation, even among the Remington staff. Access to this confidential information is on a "need-to-know basis". Each employee has an individual responsibility to safeguard confidential information which has been obtained in connection with his or her employment.

Distribution of these documents would provide Remington's competitors with an overview and summary of the entire program. This would be valuable to Remington's competitors and costly to Remington in that it would reveal the course of the program to date and Remington's plans for the program's future.

Dissemination of the material to competitors, the public and also sports writers will cause irreparable harm to Remington.

It is imperative that the documents and concepts which are Remingtons' attempt to produce a new centerfire bolt action rifle remain the confidential property of Remington. The market for that product is marked by keen competition. The market is presently estimated to have a value in the range of 180 to 200 million dollars in annual sales among the several major producers of domestic bolt action rifles. Disclosure of information relating to the development of a new product in that market would substantially impact Remington's share of that market. The loss in disclosing the property of Remington will result in actual, quantifiable, monetary loss.

FURTHER AFFIANT SAYETH NAUGHT.

/s/ William H. Coleman, II
WILLIAM H. COLEMAN, II

SWORN TO AND SUBSCRIBED BEFORE ME on this 8th day of November 1989 by WILLIAM H. COLEMAN, II.

/s/ Margaret D. Hall
Notary Public in and for
The State of New York
County of Herkimer

HECHT, Justice, dissenting.

I dissent. Before mandamus relief can properly issue, relators must demonstrate that the trial court clearly abused its discretion in denying discovery, and that they have no adequate remedy by appeal. *Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992). The plurality opinion concludes that three or four additional pages out of the thousands of Remington documents the trial court reviewed *in camera* should be produced. Only one Justice would require production of more materials. The plurality completely ignores Remington's claims that its documents are protected by a trade secret privilege and that if produced at all they should be subject to a protective order. Even assuming that the plurality's conclusion is correct, the trial court's failure to order production of three or four pages has not been shown to be in any sense a clear abuse of discretion. In *Walker* we said that generally, an ordinary appeal is not adequate to correct trial court discovery errors in three instances: (1) when the appellate court will be unable to cure the error, as when privileged information is ordered produced; (2) when a party's ability to present a viable claim or defense is vitiated or severely compromised; or (3) when the trial court disallows discovery and the requested materials cannot be made a part of the appellate record. *Id.* at 843. Because the trial court refused to compel production of the documents at issue, we are not presented with an example of the first instance. Neither is the second instance realized in this case; relator's attorney advised the court at oral argument that he "[has] a case right now" even without these documents. As for the third instance, because these documents have been made a part of a mandamus record, they can likewise be made a part of the appellate record.

From the beginning, the Court's sole apparent purpose in this case has been to ensure that relators obtain additional infor-

mation. The Court granted relators' motion for leave to file a petition for mandamus before the trial court had even issued a written order. When it discovered this deficit, which would ordinarily have been fatal to the petition, TEX.R.APP.P. 121(a)(4), instead of dismissing the petition, it ordered the trial court to reduce its ruling to writing, without any showing that the trial court had refused to do so and without any request from relators. 33 TEX.SUP.CT.J. 308 (motion for leave to file granted March 21, 1990), and 33 TEX.SUP.CT.J. 617 (noting issuance of unpublished order June 27, 1990).[1] That purpose has now been accomplished, however so slightly. It is not the best use of this Court's limited resources to micromanage discovery in the trial courts as we do today.

PHILLIPS, C.J., and GONZALEZ and CORNYN, JJ., join in this dissenting opinion.

---

1. The June 27, 1990 unpublished order provided:

> IT IS HEREBY ORDERED THAT The Honorable Ricardo Garcia, Presiding Judge, 229th District Court, Duval County, is directed to reduce to writing his oral ruling on pending motions of Plaintiffs and Defendants in *Lauro Chapa et. al. v. Remington Arms Co. et al.,* Cause No. 13,461 in connection with his in camera inspection of documents of Remington Arms Co. relating to its New Bolt Action Rifle program ("NBAR"). *See Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984) (trial court's denial of discovery of alternative designs utilized in non-identical products constitutes an abuse of discretion).

> IT IS FURTHER ORDERED that The Honorable Ricardo Garcia comply by filing such written ruling with the Clerk of the Texas Supreme Court on or before July 27, 1990.