**Opinion issued July 31, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00491-CV

————————————

**HOUSTON LIVESTOCK SHOW AND RODEO, INC., Appellant**

**V.**

**DOLCEFINO COMMUNICATIONS, LLC, Appellee**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-50038**

---

## OPINION

This appeal involves the interpretation of Section 22.353 of the Texas Business Organizations Code, which governs the public's right to inspect and copy the financial records of non-profit corporations. Appellant Houston Livestock Show and Rodeo, Inc. and Appellee Dolcefino Communications, LLC dispute whether a

non-profit corporation can withhold financial information from public disclosure under Section 22.353 based on the information's trade secret status.

Following a request from Dolcefino for inspection of financial books and records under Section 22.353, the Houston Rodeo provided its general ledger to Dolcefino reflecting, among other things, the aggregate total amount it paid to all concert performers during a three-year period. The Houston Rodeo redacted from its disclosures the individual fees paid to each performer, asserting the information was a trade secret. Dolcefino disputed the Houston Rodeo's position that the individual fees paid to performers could be withheld from public disclosure. Both parties filed declaratory judgment actions on the issue and moved for summary judgment on their claims for declaratory relief.[1]

The trial court granted in part and denied in part each party's motion for summary judgment and, as relevant here, declared that the Houston Rodeo had not established that the amount of fees it pays to individual concert performers is a trade secret. The trial court thus held that the Houston Rodeo could not redact that information from its financial records prior to disclosure under Section 22.353. This appeal followed.

---

[1] The parties requested additional declarations and moved for summary judgment on those claims for declaratory relief as well. The trial court granted in part and denied in part each party's motion for summary judgment. Only the trial court's declarations involving the Houston Rodeo's obligations to disclose the individual fees it pays to performers are relevant to the present appeal.

In three issues, the Houston Rodeo argues the trial court erred by (1) holding it had not established the trade secret nature of the individual fees it pays to concert performers because the uncontroverted declaration of its CEO and President conclusively established the information's trade secret status, (2) holding it may not redact such information from public inspection because Dolcefino failed to establish that disclosure of such information is necessary for any purpose, and the public's right to disclosure under Section 22.353 does not override the trade secret privilege, and (3) awarding attorney's fees to Dolcefino.

We conclude that the Houston Rodeo established the trade secret nature of the individual amounts it pays to concert performers and that the Houston Rodeo may thus redact such information from its general ledger prior to public inspection of its records, books, and reports under Section 22.353. We reverse the trial court's judgment and render judgment in favor of the Houston Rodeo. We remand the case to the trial court to reconsider its award of attorney's fees and costs in light of our opinion.

## Background

Section 22.353 of the Texas Business Organizations Code requires non-profit corporations to "keep records, books, and annual reports of the corporation's financial activity . . . for at least three years after the close of the fiscal year" and to make those "records, books, and reports available to the public for inspection and

3

copying." TEX. BUS. ORGS. CODE § 22.353(a)–(b). Failure to maintain such records or to make such records available to the public as required by Section 22.353 is a Class B misdemeanor. *Id.* § 22.354.

The Houston Livestock Show & Rodeo, Inc. ("HLSR") is a charitable non-profit corporation whose mission is to promote "agriculture by providing a family-friendly live entertainment experience that educates the public, supports Texas youth, and showcases Western heritage." As a non-profit corporation, HLSR is subject to the requirements of Section 22.353.

The underlying dispute between HLSR and Appellee Dolcefino Communications, LLC began when Dolcefino was hired to investigage an alleged sexual assault occuring in 2017 at a Los Vaqueros Trail Ride event in Liberty County, Texas. *See In re Hous. Livestock Show & Rodeo, Inc.*, No. 01-18-00825-CV, 2019 WL 2376120, at *1 (Tex. App.—Houston [1st Dist.] June 6, 2019, orig. proceeding) (mem. op.). The claimant, Brie Anna Williams, filed a personal injury lawsuit arising from the sexual assault. *Id.* She filed claims against the man who allegedly sexually assaulted her, his alleged accomplice, Los Vaqueros Rio Grande Trail Ride Association, LLC, and HLSR ("Williams Suit").[2] *Id.* Williams retained Dolcefino as an investigative consultant for the lawsuit. *Id.*

---

[2]    The style of that suit is *Brie Anna Williams v. Alvin Wesley Pine et al.*, Cause No. 2017-19367, in the 334th District Court of Harris County, Texas.

In 2018, while working as Williams' investigator, Dolcefino sent a series of requests to HLSR requesting to inspect and obtain copies of HLSR's financial records under Section 22.353. Among the laundry list of requested records,[3] Dolcefino requested "[c]opies of documents detailing [HLSR's] general ledger for the last three fiscal years."[4] *Id.* at *2. On June 27, 2018, HLSR notified Dolcefino that it was preparing HLSR's general ledger for the last three fiscal years for "public inspection," but that it would be redacting from its general ledger the individual amounts paid to performers because HLSR considered that information as proprietary, confidential, and trade-secret information. *Id.* HLSR also advised Dolcefino that it would be filing a declaratory judgment action. *Id.* Dolcefino

---

[3] Dolcefino requested 23 separate categories of documents for inspection under Section 22.353. HLSR filed a motion for protection in the Williams Suit arguing that Dolcefino, as Williams' agent, was seeking discovery while trying to circumvent discovery rules. *See In re Hous. Livestock Show & Rodeo, Inc.*, No. 01-18-00825-CV, 2019 WL 2376120, at *2 (Tex. App.—Houston [1st Dist.] June 6, 2019, orig. proceeding) (mem. op.). Dolcefino argued that its requests were unrelated to the personal injury action pending in the Williams Suit. The trial court denied HLSR's motion for protection. *See id.* Subsequently, on June 20, 2018, HLSR "provided Dolcefino with three years' worth of HLSR annual reports," but it informed Dolcefino that the public records inspection (tentatively scheduled for June 21) would be postponed "while HLSR consider[ed] its legal and appellate options." *Id.* That same day, Dolcefino filed a criminal complaint with the Harris County District Attorney and a demand for the District Attorney to prosecute HLSR under Section 22.354. *See* TEX. BUS. ORGS. CODE § 22.354 (providing that failure to comply with Section 22.353 is Class B misdemeanor).

[4] Dolcefino filed numerous requests for public inspection under Section 22.353. Only its request for disclosure of the individual fees HLSR pays to concert performers is at issue in this appeal.

followed up with another Section 22.353 request, this time asking for inspection of all HLSR "performance contracts with any concert performer from Jan. 1, 2014 to the present." *Id.*

On July 19, 2018, HLSR made its general ledger for the fiscal years 2014, 2016, and 2017 available to Dolcefino for inspection. Although the ledger excluded the individual amounts paid to each concert performer, the ledger included the total aggregate amount HLSR paid to all concert performers for the last three fiscal years. HLSR subsequently filed an original petition for declaratory relief seeking a declaration that HLSR had complied with its obligations under Section 22.353 and that it was not criminally liable under Section 22.354 of the Business Organizations Code. *See id.* at \*3; *see also* TEX. BUS. ORGS. CODE §§ 22.353(b) (describing public disclosure obligations for non-profit corporations), 22.354 (stating that failure to comply with Section 22.353 is Class B misdemeanor).[5] Among other relief, HLSR asked the trial court to declare that:

> HLSR is not required to allow public inspection of its performance contracts with any concert performer from Jan. 1, 2014 to the present because that request does not seek financial records (i.e., corporate books, records, or reports).

---

[5] HLSR initially sought leave to file a third-party declaratory judgment action against Dolcefino in the Williams Suit, but the trial court in that suit denied HLSR's motion. HLSR thus filed an original petition for declaratory relief against Dolcefino in a separate action. *See In re Hous. Livestock Show & Rodeo, Inc.*, 2019 WL 2376120, at \*1.

> HLSR is entitled to redact information in its general ledger prior to public inspection that is confidential, business proprietary, and trade secret, or determined by law to be free from disclosure (such as major donor names and amounts).
>
> HLSR seeks a declaration that the fees paid to performers at the rodeo constitute confidential, business proprietary, and trade secret information not subject to public disclosure requests.

HLSR also sought the recovery of reasonable and necessary attorney's fees.

Dolcefino filed a general denial and asserted several counterclaims against HLSR, including a claim for declaratory relief asking the trial court to declare that HLSR "is required to make available for inspection and copying all financial records sought by all of the written requests sent pursuant" to Section 22.353, and that HLSR had "violated Section 22.354 of the Texas Business Organizations Code." Dolcefino also sought a declaration that HLSR "is not entitled to 'redact' the financial records sought by all of the written requests" and that confidential "information is not protected from requests made pursuant to Sections 22.352 and 22.353 of the Texas Business Organizations Code."[6]

HLSR moved for summary judgment on its claims for declaratory relief seeking a "determination of its own duties and obligations to comply" with the

---

[6] Dolcefino also asserted counterclaims against HLSR for violation of Texas Penal Code Section 36.06, negligence per se based on violation of the Penal Code, gross negligence and malice, and malicious prosecution, but it later dropped those claims. *See* TEX. PENAL CODE § 36.06 (defining criminal offense of obstruction or retaliation).

7

public record request sent by Dolcefino under Section 22.353. HLSR argued that it had provided "Dolcefino with a right of public inspection of its general ledger for the last three fiscal years – redacted only to exclude (1) the amount of fees paid to performers at the rodeo . . . and (2) major donor names and amounts." Among its numerous requests for declaratory relief, HLSR argued that it was not required to disclose the fees it paid to individual performers under Section 22.353 because it had established that such information is "confidential, business propriety information, and trade secret information of HLSR." HLSR thus argued that it was entitled to a declaration from the trial court that the fees it pays to performers at the rodeo are "confidential, business proprietary information and/or trade secrets that HLSR is entitled to redact from the general ledgers before public inspection." In support of its motion for summary judgment, HLSR submitted the declaration of its custodian of records and Dolcefino's public records requests to HLSR, as well as the declarations of its President and Chief Executive Officer Joel Cowley and its Chief Financial Officer Jennifer Hazelton.

Dolcefino filed a cross-motion for summary judgment on its claims for declaratory relief. Among other things, Dolcefino argued that it was entitled to declarations that HLSR is "not entitled to 'redact' the financial records sought by all of the written requests sent pursuant to the Nonprofit Corporations section of the Texas Business Organizations Code Chapter 22, which are attached to and made the

8

basis of the Rodeo's suit" and that "'confidential' information is not protected from requests made pursuant to Sections 22.352 and 22.353 of the Texas Business Organizations Code."[7, 8] In support of its motion, Dolcefino submitted the general ledger produced by HLSR and the declarations of Wayne Dolcefino and Carter McCormack.

The trial court conducted a hearing on the parties' cross-motions for summary judgment and concluded that no fact issues precluded the issuance of summary judgment concerning the scope of Section 22.353. The trial court granted in part and denied in part the parties' cross-motions for summary judgment on their

---

[7] Dolcefino filed a motion in the Williams Suit seeking to transfer and to consolidate the underlying declaratory judgment actions with the personal injury action in that case. On the day Dolcefino's motion was set for hearing, Williams filed a motion to dismiss her claims against HLSR and her counsel appeared in court to announce settlement. Dolcefino nonetheless advocated for transfer and consolidation, asserting that the personal injury case was still pending because the dismissal had not yet been signed. It also argued that its inspection requests under Section 22.353 could be directly relevant to the personal injury case. The Williams trial court granted the requested consolidation, and HLSR filed a Petition for Writ of Mandamus with this Court seeking to set aside the trial court's order. This Court conditionally granted HLSR's petition and directed the trial court to withdraw its order granting Dolcefino's motion to transfer and to consolidate. *See In re Hous. Livestock Show & Rodeo, Inc.*, 2019 WL 2376120, *8.

[8] Dolcefino also moved to dismiss HLSR's declaratory judgment action under the Texas Citizens Participation Act ("TCPA"). By agreement of the parties, the trial court heard that motion during the hearing on the parties' cross-motions for summary judgment. The trial court denied Dolcefino's TCPA motion to dismiss and HLSR's corresponding request for costs and reasonable attorney's fees incurred in opposing the motion. Neither Dolcefino nor HLSR appeal from the trial court's rulings on Dolcefino's TCPA motion to dismiss.

declaratory judgment claims.[9] Relevant to this appeal, the trial court declared that Dolcefino is "entitled to inspect financial records, books and reports that show expenditures to all requested individuals and entities and the stated purpose of said expenditure." The trial court declared that HLSR is "not entitled to redact performer expenditures" and that HLSR had not "establish[ed] that the performer fees are a trade secret and not subject to public inspection pursuant to Tex. Bus. Orgs. Code § 22.353."[10]

HLSR moved for entry of judgment arguing that no fees should be awarded to either party. Dolcefino objected, arguing it was entitled to attorney's fees. After considering the issue of attorney's fees by written submission, the trial court issued its Final Judgment awarding Dolcefino $28,525 in reasonable and necessary attorney's fees and $32,500 in conditional appellate attorney's fees.

This appeal followed.

---

[9] Dolcefino does not appeal from the trial court's partial denial of its motion for summary judgment.

[10] Among its numerous requests to HLSR under Section 22.353, Dolcefino requested inspection of "[a]ll performance contracts with any concert performer from January 1, 2014 to the present." Although the trial court held that Dolcefino is "entitled to inspect financial records, books and reports that show expenditures to all requested individuals and entities and the stated purpose of said expenditure," the court also declared that the term "financial records, books and reports," as used in Section 22.353, does not include "performance contracts."

**Standard of Review and Applicable Law**

**A.     Declaratory Judgments**

The Uniform Declaratory Judgments Act is remedial in nature. Its "purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE § 37.002(b); *see Gulshan Enters., Inc. v. Zafar, Inc.*, 530 S.W.3d 298, 305 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "A declaratory judgment, by its nature, is forward looking; it is designed to resolve a controversy and prevent future damages. It affects a party's behavior or alters the parties' legal relationship on a going-forward basis." *Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 660 (Tex. 2009). A trial court may render a declaratory judgment if it serves a useful purpose or will terminate the controversy between the parties. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 468 (Tex. 1995); *Gulshan Enters., Inc.*, 530 S.W.3d at 305.

Under the Uniform Declaratory Judgments Act, a court "may award . . . reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009; *Gilbreath v. Horan*, 682 S.W.3d 454, 565 (Tex. App.—Houston [1st Dist.] 2023, pet. denied).

**B.     Summary Judgment**

A declaratory judgment rendered by summary judgment is reviewed under the same standards that govern summary judgments generally. *Hourani v. Katzen*, 305

11

S.W.3d 239, 248 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We review the trial court's grant of a summary judgment *de novo*. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). For a traditional motion for summary judgment, the moving party must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lujan*, 555 S.W.3d at 84. If the movant satisfies its burden, the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *Lujan*, 555 S.W.3d at 84.[11]

When the trial court considers cross-motions for summary judgment and grants one motion but denies the other, "we consider the summary judgment evidence presented by both sides, determine all questions presented, and if the trial court erred, we render the judgment the trial court should have rendered." *Sw. Bell Tel. L.P. v. Emmett*, 459 S.W.3d 578, 583 (Tex. 2015); *see also Gramercy Ins. v. MRD Invs., Inc.*, 47 S.W.3d 721, 724 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (stating if issue raised on appeal is based upon undisputed and unambiguous

---

[11]    "If a factual dispute is the only issue to be resolved, a declaratory judgment is not the proper remedy." *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 699–700 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The trial court stated in its order that HLSR and Dolcefino had agreed that the material facts were undisputed in connection with the declaratory action, and it thus concluded that "summary judgment [was] appropriate in this matter."

12

facts, reviewing court may determine question presented as matter of law and either affirm judgment or reverse and render judgment trial court should have rendered).

## Discussion

We first consider whether HLSR established that the amount it pays to individual concert performers is a trade secret. If we determine that HLSR established the trade secret nature of such information, the question before us is whether HLSR may withhold that information from public inspection under Section 22.353—a question both parties characterize as a matter of first impression.

HLSR argues that the trial court erred by declaring that HLSR failed to establish that the fees its pays to individual performers are a trade secret and that HLSR has no right to redact such information from its financial records before disclosure to Dolcefino under Section 22.353. HLSR argues that while the public has a right to inspect the books and records of a non-profit corporation, the non-profit corporation's trade secrets are entitled to protection from disclosure. According to HLSR, the uncontroverted declaration of its President and CEO Joel Cowley conclusively established that the amount HLSR pays to individual concert performers is a trade secret, and Dolcefino did not establish that disclosure of this trade secret information is necessary for any purpose. Moreover, because the general ledger HLSR provided to Dolcefino included the total aggregate amount HLSR paid

13

to all performers for three fiscal years, HLSR argues it fulfilled the purpose of Section 22.353 to show the "nature of its expenditures."

Dolcefino responds that the trial court did not abuse its discretion by denying HLSR's motion for summary judgment seeking declaratory relief with respect to the performance fees HLSR pays to individual performers because HLSR did not present any evidence to establish that such information is a trade secret as a matter of law. Dolcefino also argues that Section 22.353 does not allow a non-profit corporation to redact information from its books and records prior to disclosure to the general public.

For the reasons set forth below, we hold that HLSR established that the amount of fees it pays to individual concert performers is a trade secret and that the public's right to inspection under Section 22.353 does not trump HLSR's right to protect its trade-secret information. HLSR is thus entitled to redact the fees it pays to individual concert performers from its general ledgers prior to disclosure to Dolcefino under Section 22.353.

## Texas Business Organizations Code

Chapter 22 of the Texas Business Organizations Code governs domestic non-profit corporations. *See* TEX. BUS. ORGS. CODE §§ 22.351–.356. Section 22.353(a)–(b), which governs the disclosure of a non-profit corporation's records, books, and annual reports to the public, states:

14

> (a)     A corporation shall keep records, books, and annual reports of the corporation's financial activity at the corporation's registered or principal office in this state for at least three years after the close of the fiscal year.
>
> (b)     The corporation shall make the records, books, and reports available to the public for inspection and copying at the corporation's registered or principal office during regular business hours.  The corporation may charge a reasonable fee for preparing a copy of a record or report.

*Id.* § 22.353(a)–(b) (formerly TEX. REV. CIV. STAT. art. 1396-2.23A § C).[12]  The purpose of Section 22.353 is to "expose the nature of the expenditures of [the non-profit's] money once received from the public and to make non-profit organizations accountable to their contributors for those expenditures."  *In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 381 (Tex. 1998).  A non-profit corporation's "fail[ure] to maintain a financial record, prepare an annual report, or make the record or report available to the public in the matter required by Section 22.353" is a Class B misdemeanor.  TEX. BUS. ORGS. CODE § 22.354.

---

[12]     The Texas Nonprofit Corporation Act, including article 1396–2.23A § C of the Texas Civil Statutes, expired in 2010 and was re-codified in Chapter 22, Subchapter H, of the Texas Business Organizations Code.  *See* Act of May 13, 2003, 78th Leg., R.S., ch. 182 § 1, 2003 Tex. Gen. Laws 267, 483–87 (codified at TEX. BUS. ORGS. CODE §§ 22.351–.365); *see also Knapp Med. Ctr., Inc. v. Grass*, 443 S.W.3d 182, 188 (Tex. App.—Corpus Christi–Edinburg 2013, pet. denied) ("Section 22.353 is essentially a re-codification of the now defunct Texas Civil Statutes article 1396–2.23A § C into the Texas Business Organizations Code.").

## Trade Secret Status

HLSR argues that the amount of fees it pays to individual performers is a trade secret and that pursuant to the Restatement of Torts and Rule 507 of the Texas Rules of Evidence it has a right to withhold that information from disclosure under Section 22.353. *See* TEX. R. EVID. 507; *see also In re Bass*, 113 S.W.3d 735, 739–45 (Tex. 2003) (orig. proceeding) (applying Rule of Evidence 507 and Restatement of Torts factors when determining whether party asserting trade secret privilege was required to disclose trade secret).

Texas Rule of Evidence 507, which provides for the protection of trade secrets during the discovery process, states that a "person has a privilege to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, unless the court finds that nondisclosure will tend to conceal fraud or otherwise work injustice." TEX. R. EVID. 507(a).[13] Rule 507 seeks to accommodate two competing interests. *See In re 4X Indus., LLC*, 639 S.W.3d 801, 807 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (orig. proceeding) (citing *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 612 (Tex. 1998) (orig. proceeding), and *In re Cooper Tire & Rubber Co.*, 313 S.W.3d 910, 915 (Tex. App.—Houston [14th Dist.] 2010, orig. proceeding)). While Rule 507 "recognizes that trade secrets are an important

---

[13]  Rule 507 further provides that "[i]f a court orders a person to disclose a trade secret, it must take any protective measure required by the interests of the privilege holder and the parties and to further justice." TEX. R. EVID. 507(a).

16

property interest, worthy of protection," Rule 507 also "recognizes the importance placed on fair adjudication of lawsuits," and the rule "accommodates both interests by requiring a party to disclose a trade secret only if necessary to prevent fraud or injustice." *Id.* at 807–08 (internal quotations omitted); *see* TEX. R. EVID. 507(a) (stating party is entitled to refuse disclosure of trade secrets unless court finds nondisclosure "will tend to conceal fraud or otherwise work injustice").

The party asserting a trade secret privilege under Rule 507 must establish that the information sought qualifies as a trade secret. *In re Bass*, 113 S.W.3d at 737; *In re Cooper Tire & Rubber Co.*, 313 S.W.3d at 915. If the party asserting the trade secret privilege meets its burden, the burden shifts to the party seeking disclosure of the trade secret to establish that the information it seeks is necessary for a fair adjudication of its claim. *See In re Bass*, 113 S.W.3d at 737; *see also In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732 (Tex. 2003) (orig. proceeding) (stating requesting party must prove information is "necessary or essential to the fair adjudication of the case, weighing the requesting party's need for the information against the potential of harm to the resisting party from disclosure"); *In re 4X Indus., LLC*, 639 S.W.3d at 813 (stating burden "requires the requesting party to present evidence") (citing *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 615). It is an abuse of discretion for a trial court to order the disclosure of requested information once the information's trade secret status is established if the party seeking disclosure fails to

17

establish a need for the requested information.  *In re 4X Indus., LLC*, 639 S.W.3d at 813–14 (citing *In re Bass*, 113 S.W.3d at 738); *see also In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 591–92 (Tex. 2009) (orig. proceeding) (stating when "information is a trade secret and the requesting parties do not need it, an order that requires disclosure is a clear abuse of discretion").

## A.    HLSR's Trade Secret Information

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it."  *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996).  The Texas Uniform Trade Secrets Act, generally applicable to misappropriation claims, also defines a trade secret as information, including financial data, that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(B).[14]

---

[14]    Dolcefino cites to Section 134A.002(6) of the Texas Uniform Trade Secrets Act ("TUTSA") for the definition of a "trade secret."  TUTSA, which was enacted in 2013, typically applies to trade secret misappropriation claims.  *See HouseCanary, Inc. v. Title Source, Inc.*, 622 S.W.3d 254, 256 (Tex. 2021) (discussing TUTSA in trade secret misappropriation case).  While the present case does not involve a claim for misappropriation, we find TUTSA's definition of "trade secret" instructive to our analysis.

To determine whether information constitutes a trade secret, courts evaluate six factors enumerated in the Restatement of Torts. *See In re Bass*, 113 S.W.3d at 739, 741–42 (applying Rule of Evidence 507 and Restatement of Torts factors when determining whether party asserting trade secret privilege is required to disclose trade secret); *see also In re 4X Indus., LLC*, 639 S.W.3d at 807–08 (same). Courts consider:

(1) the extent to which the information is known outside the business;

(2) the extent to which it is known by employees and others involved in the business;

(3) the extent of measures taken to guard the secrecy of the information;

(4) the value of the information to the business and its competitors;

(5) the amount of effort or money expended in developing the information; and

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d at 739 (quoting RESTATEMENT OF TORTS § 757 cmt. B. (AM. L. INST. 1939) and RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 rep.'s n. cmt. d. (AM. L. INST. 1995)). Trade secrets do not "fit neatly into each factor every time." *Id.* at 740. Thus, a party claiming trade secret status need not satisfy all six factors. *Id.* Courts instead weigh the factors in the context of the surrounding circumstances to determine whether the information qualifies as a trade secret. *Id.*

19

at 739; *see also Bishop v. Miller*, 412 S.W.3d 758, 768 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("The status of the information claimed as a trade secret must be determined through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information[.]").

HLSR argues that the trial court erred by holding that HLSR "failed to establish that the performer fees are a trade secret" and declaring that HLSR could not redact such information from its records, books, and annual reports before making them available to the public for inspection and copying because the declaration of its President and CEO Joel Cowley conclusively established that the amount of fees HLSR pays to individual concert performers is a trade secret, and Dolcefino did not establish that disclosure of such information is necessary. HLSR further argues that it has a right to redact its trade secret information because the general public's "rights of inspection [under Section 22.353] do not trump rights of privilege for non-disclosure."

Dolcefino responds that HLSR did not present evidence to establish that the amount of the performance fees it pays to performers is a trade secret. Moreover, according to Dolcefino, the disclosure requirement of Section 22.353 is absolute and does not allow a non-profit corporation to redact information before making its records, books, and annual reports available to the public.

## 1.      Evidence Establishing Trade Secret Status

In support of its summary judgment motion, HLSR submitted the declaration of its President and CEO Joel Cowley.  HLSR argues that Cowley's declaration "addressed five of the six Restatement of Torts factors" and "provided unrebutted factual support of how each factor was met."  In his declaration, Cowley stated:

> The compensation paid to the artists individually for their performances at the Rodeo is considered highly confidential, proprietary business information, and a trade secret of HLSR.
>
> The performance contracts between HLSR and individual concert performers are not publicly available.  HLSR does not disclose or share the contents of its performance contracts between each of the various artists and HLSR, including the compensation paid for the performance, with outsiders.  The performance contracts, particularly the compensation paid for the concert performance, are treated as closely guarded secrets of HLSR.  None of the performers know what any of the other performers are paid by HLSR, and the performance contracts contain confidentiality clauses requiring the performing artist to agree to keep the amount of the performance fee confidential and to not disclose the amount to any third party other than persons who have a need to know in order to aid or facilitate the performance.
>
> Consistent with the highly confidential, trade secret nature of the amount of each artist's compensation, HLSR carefully guards this information in its offices and takes steps to maintain the secrecy of this information.  Access to the information is very narrowly limited. Even within HLSR, access is restricted to a very small group of employees on a "need to know" basis.
>
> In addition to myself, the only persons associated with the organization who have access to individual artist's compensation information are HLSR's Managing Director and Manager of Entertainment and Concert Production, Chief Financial Officer, Controller, and General Counsel, and they are required to keep the information confidential.  Other HLSR

21

personnel do not have access to this information, nor do members of HLSR's Executive Committee of its Board of Directors.

Offer letters to artists and subsequent performance contracts are personally delivered to me in my office by the Managing Director or Manager of Entertainment and Concert Production. My office in the executive suite is located on the opposite side of the main corridor from the staff offices, and my assistant sits directly outside of my office. Upon execution of the performance contracts, I personally return them to the Managing Director and Manager of Entertainment and Concert Production, and they are stored in a locked filing cabinet inside the offices of the Entertainment & Concert Production Department.

Disclosure of the amount paid to the individual artists for their performances could be highly detrimental to HLSR's efforts to negotiate and retain future artists for performances at the Rodeo. The information could be used by performers as a bargaining chip to raise their performance fees. Additionally, having this information disclosed would allow competitors accessing the information to use the information to negotiate agreements with the performers, hurting HLSR's competitive advantage and causing substantial competitive harm to HLSR. Increased costs to acquire Rodeo performers would reduce HLSR's income and subsequently result in less money available for HLSR's mission, including educational programs and scholarship awards.

Since 1942, HLSR has been providing unparalleled entertainment opportunities, greatly contributing to its popularity and growth. HLSR's ability to attract top entertainers has allowed it to commit $450 million to youth and education and generate an annual regional economic impact in excess of $400 million.

Given the closely guarded secrecy with which this information is maintained, members of the public or the press or other entertainment venues would have no way to acquire this information.

22

Dolcefino did not submit any summary judgment evidence refuting Cowley's factual assertions.[15] Instead, Dolcefino challenged the facial sufficiency of Cowley's declaration. According to Dolcefino, Cowley failed to establish that the amount HLSR pays to individual performers is a trade secret because Cowley merely opined that "the information *could* derive independent economic value from not being generally known, not that it *does* derive independent economic value from not being generally known" and "the revelation of the amount paid to the individual artists who perform at the Rodeo *could be* detrimental, not that the release of the information *would be* detrimental to the Rodeo's ability to negotiate and retain future artists." (Emphasis in original).

As it concerns the first two Restatement of Torts factors, Cowley's declaration establishes that the amount of the performance fees HLSR pays to individual performers is closely guarded information that is known only by the performers and six HLSR employees on a "need to know" basis: Cowley, the Managing Director, the Manager of Entertainment and Concert Production, the Chief Financial Officer, the Controller, and the General Counsel for HLSR. *See* RESTATEMENT OF TORTS § 757; *see also In re Bass*, 113 S.W.3d at 739 (stating that when determining whether information constitutes trade secret, courts consider "the extent to which it is known

---

[15] The trial court's summary judgment order states: "The parties agree that the material facts are undisputed in connection with the declaratory action."

23

by employees and others involved in his business," "the extent to which the information is known outside of his business," and "the extent of the measures taken by him to guard the secrecy of the information."). According to Cowley, the "performance contracts contain confidentiality clauses requiring the performing artist to agree to keep the amount of the performance fee confidential and to not disclose the amount to any third party other than persons who have a need to know in order to aid or facilitate the performance," and the six HLSR employees who have access to "individual artist's compensation information . . . are required to keep the information confidential."

Cowley's declaration also supports the third Restatement of Torts factor. It establishes that HLSR takes other measures to guard the secrecy of an individual artist's compensation information, in addition to limiting the number of people with access to this confidential information. RESTATEMENT OF TORTS § 757; *see also In re Bass*, 113 S.W.3d at 739 (stating that when determining whether information constitutes trade secret, courts consider "the extent of the measures taken by him to guard the secrecy of the information"). According to Cowley, all offer letters and performance contracts are personally delivered to him in his office by the Managing Director or Manager of Entertainment and Concert Production, and after a performance contract is executed, Cowley personally returns the contract to the Managing Director and Manager of Entertainment and Concert Production. These

24

contracts "are stored in a locked filing cabinet inside the offices of the Entertainment & Concert Production Department."

As it concerns the fourth Restatement of Torts factor, Cowley explained that the amount HLSR pays to individual performers is valuable to HLSR, as well as to HLSR's competitors. *See* RESTATEMENT OF TORTS § 757; *see also In re Bass*, 113 S.W.3d at 739 (stating that when determining whether information constitutes trade secret, courts consider "the value of the information to him and to his competitors"). In his declaration, Cowley stated that "HLSR's ability to attract top entertainers has allowed it to commit $450 million to youth and education and generate an annual regional economic impact in excess of $400 million" and that "[d]isclosure of the amount paid to the individual artists for their performances could be highly detrimental to HLSR's efforts to negotiate and retain future artists for performances at the Rodeo." According to Cowley, maintaining the secrecy of the amount HLSR pays to an individual artist for their Rodeo performance is valuable to HLSR because, if disclosed, prospective concert performers could use this information "as a bargaining chip to raise their performance fees," and HLSR's concert venue competitors would be able to "use the information to negotiate agreements with the performers, hurting HLSR's competitive advantage and causing substantial competitive harm to HLSR." Cowley stated that disclosure of this information would lead to "[i]ncreased costs to acquire Rodeo performers" which "would reduce

25

HLSR's income and subsequently result in less money available for HLSR's mission, including educational programs and scholarship awards."

And in support of the sixth Restatement of Torts factor, Cowley stated that given the measures HLSR takes to guard the confidentiality of an individual performer's compensation, such as including confidentiality clauses in all performance contracts and otherwise limiting the number of people with access to the information, "members of the public or the press or other entertainment venues would have no way to acquire this information." *See* RESTATEMENT OF TORTS § 757; *see also In re Bass*, 113 S.W.3d at 739, 742 (stating that when determining whether information constitutes trade secret, courts consider "the ease or difficulty with which the information could be properly acquired or duplicated by others").

Cowley's uncontroverted declaration thus provides evidence supporting five of the six Restatement of Torts factors courts consider to determine whether information constitutes a trade secret, and all five factors weigh in favor of concluding that the amount of fees HLSR pays to individual performers is a trade secret.[16]  *See In re Bass*, 113 S.W.3d at 739 (discussing six factors set forth in

---

[16]    Under the fifth Restatement of Torts factor, courts consider the amount of effort or money expended in developing the information. *See* RESTATEMENT OF TORTS § 757 cmt. B. (AM. L. INST. 1939); *see also In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (orig. proceeding).  As HLSR acknowledges, Cowley's declaration does not address this factor.  As noted, however, trade secrets will not always fit into each factor and a party need not establish all six factors to establish trade secret status.  *See In re Bass*, 113 S.W.3d at 740.

Restatement of Torts that courts consider when evaluating whether information qualifies as trade secret).

Cowley's declaration also demonstrates that the amount of fees HLSR pays to individual performers is financial data that derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who could gain an advantage over HLSR when negotiating agreements with performers. *See Comput. Assocs. Int'l, Inc.*, 918 S.W.2d at 455 (explaining that trade secret is any compilation of information which presents opportunity to obtain advantage over competitors who do not know or use it); *see also* TEX. CIV. PRAC. & REM. CODE § 134A.002(6)(B) (defining trade secret, in part, as information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information").

Courts generally recognize that customer lists or financial information that can be used to obtain customers or to negotiate pricing or fees to obtain an advantage in the market qualifies as a trade secret. *See In re Union Pac. R.R. Co.*, 294 S.W.3d at 592 (holding "manner and method that Union Pacific employs to calculate and arrive at shipping rates" constitutes trade secret in part because disclosure would give competitors "a pricing advantage" over Union Pacific); *T-N-T Motorsports, Inc.*

27

*v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) ("Items such as customer lists, pricing information, client information, customer preferences, buyer contacts, market strategies, blueprints, and drawings have been shown to be trade secrets."); *see also Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 859 (Tex. App.—Fort Worth 2003, no pet.) (holding pricing information, customer lists, sales and payroll data were entitled to trade secret protection in part because competitor could use information to gain advantage over plaintiff); *In re Desa Heating, L.L.C.*, No. 2-06-088-CV, 2006 WL 1713489, at *2 (Tex. App.—Fort Worth June 22, 2006, orig. proceeding) (mem. op.) (holding financial information was trade secret when company would be harmed by its disclosure because customers could use information to renegotiate their prices with company, and competitors could use information to "undercut [company] in its pricing in an effort to obtain [company's] customers").

Dolcefino argues that Cowley's declaration does not establish trade secret status because Cowley's declaration falls short of establishing that the fees HLSR pays to performers derive independent economic value from not being generally known or that disclosure of such information would be detrimental to HLSR's ability to negotiate and retain future performers. According to Dolcefino, Cowley's statements that the performance fees "*could*" derive independent economic value from not being generally known and that disclosure of such information "*could* be

28

highly detrimental to HLSR's efforts to negotiate and retain future artists for performances at the Rodeo" merely establish that the performance fees *may* qualify as trade secrets in the future. Citing to *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253 (5th Cir. 2007), Dolcefino argues that it "is not enough to simply show []that the evidence is of the type that *may* constitute a trade secret, HLSR must prove that this particular information *is* a trade secret by presenting sufficient evidence to meet the standard for same." *See id.* at 266 (stating plaintiff "seems to confuse what *constitutes* a trade secret with the evidence necessary to *prove* that trade secret. . . . For [Plaintiff] to succeed on any of these claims, then, it must first prove that it in fact possessed (1) proprietary information, that was (2) valuable to its business.") (emphasis in original)).[17]

---

[17] Citing to Justice Doggett's concurring opinion in *Chapa v. Garcia*, 848 S.W.2d 667 (Tex. 1992), Dolcefino also argues that HLSR failed to prove that its payments to individual concert performers are trade secrets because Cowley's declaration is the only evidence HLSR submitted in support of its claim of trade secret status. *See id.* at 671 (Doggett, J., concurring) (stating party asserting trade secret privilege failed to establish requested information was trade secret because party's "evidence was limited to a single *secret* affidavit which, as a matter of law, cannot constitute supportive evidence") (emphasis added). According to Dolcefino, "[u]nlike this case, at least [the party asserting the trade secret privilege in *Chapa*] permitted an *in camera* inspection of the information alleged to be trade secret."

Dolcefino's reliance on *Chapa* is misplaced. The plurality opinion in *Chapa* did not hold that the party asserting the trade secret privilege had not established the trade secret nature of its documents because it had submitted only one affidavit in support. Instead, a plurality of the court held the trial court had abused its discretion by not ordering production of the withheld documents because some of the documents were responsive to Chapa's discovery request. *See id.* at 668 (plurality op.). Furthermore, unlike here, the affidavit in *Chapa* was filed *ex parte*. *Id.* at 671

Dolcefino's reliance on *Triple Tee Golf* is misplaced.[18] *Triple Tee Golf* does not require a party asserting trade secret status to establish with any degree of certainty that the trade secret information derives actual independent economic value from not being generally known. *See id.* (stating party asserting trade secret status must prove it "possessed (1) proprietary information, that was (2) valuable to its business"). Evidence establishing that the information has potential economic value has been held sufficient to prove the existence of a trade secret. *See In re Cooper Tire & Rubber Co.*, 313 S.W.3d at 918 (holding fourth Restatement of Torts factor concerning value component of information was established and thus weighed in

---

(Doggett, J., concurring) (stating *ex parte* filing of affidavit "is improper[,]" it "cannot provide the evidence necessary to carry [the party's] burden of proof").

To the extent Dolcefino argues that HLSR was required to submit its individual performer fees for *in camera* inspection, Dolcefino did not make this argument in the trial court or direct the court to any authority requiring such an inspection. Moreover, Dolcefino has not explained why the trial court would need to review the actual dollar amounts paid to an individual performer to determine whether that information is a trade secret, and we see no benefit to an *in camera* inspection of the redacted information.

[18]   In *Triple Tee Golf*, a producer of golf clubs sued a competitor and a golf club designer employed by the competitor for misappropriation of trade secrets, among other claims. 485 F.3d 253 (5th Cir. 2007). "At bottom, each of [the plaintiff's] claims involve[d] an allegation that the [d]efendants [had] unlawfully used [its] proprietary club design, causing it financial injury." *Id.* at 267. The court explained that to succeed on its claims, the plaintiff had to establish that "it in fact possessed (1) proprietary information, that was (2) valuable to its business." *Id.* The court then analyzed whether a trade secret existed by applying the six-factor test under the Restatement of Torts. *Id.* Nothing in *Triple Tee Golf* suggests that more than what HLSR offered through the declaration of Cowley in support of the Restatement of Torts factors was necessary to establish the trade secret nature of the fees HLSR pays to concert performers.

30

favor of finding trade secret status where plaintiff produced affidavit stating "a competitor could use the information to copy Cooper Tire's products," "a competitor could discern or infer certain qualities about Cooper Tire's products and thereby adjust its product or warrant practice to the same level to better compete," and that "a competitor could discern or infer the demand for particular types of products, and such information could be used to the competitor's advantage"); *see also In re Goodyear Tire & Rubber Co.*, 392 S.W.3d at 695 (holding value component of trade secret status established with affidavit stating "competitors could use the information . . . [to] give them a technical advantage [over Goodyear]"); *In re Desa Heating, L.L.C.*, 2006 WL 1713489, at *2 (holding party asserting trade secret status proved existence of trade secret when affidavit asserted that if information was disclosed to public, party's "customers and vendors could use the information to renegotiate their prices with [the party], and its competitors could use the information to 'undercut [the party] in its pricing in an effort to obtain [the party]'s customers").[19]  Indeed, the definition of trade secret Dolcefino advances in its brief establishes as much.  Section 134A.002(6) of the Texas Civil Practice and Remedies Code, on which Dolcefino relies, defines a trade secret, in part, as financial data that

---

[19]    The court in *In re Desa Heating, L.L.C.* held that such "statements, while somewhat conclusory and lacking in detail, [were] nevertheless sufficient to establish the competitive value of the information to [the party's] pricing strategy."  No. 2-06-088-CV, 2006 WL 1713489, at *2 (Tex. App.—Fort Worth June 22, 2006, orig. proceeding) (mem. op.).

"derives independent economic value, actual o*r potential*, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." Tex. Civ. Prac. & Rem. Code § 134A.002(6) (emphasis added).

We further note that contrary to Dolcefino's argument, Cowley's declaration does not merely state that the information HLSR seeks to protect from disclosure "could" derive independent economic value and that disclosure "could" be highly detrimental. As HLSR points out, Cowley also states in his declaration that disclosure of the individual fees HLSR pays to concert performers "would allow competitors accessing the information to use the information to negotiate agreements with the performers, hurting HLSR's competitive advantage and causing substantial competitive harm to HLSR" and that "[i]ncreased costs to acquire Rodeo performers would reduce HLSR's income and subsequently result in less money available for HLSR's mission, including educational programs and scholarship awards." These statements support the Restatement of Torts factor concerning the "value of the information to the business and its competitors" and thus support a finding in favor of trade secret status.

Based on Cowley's declaration, we hold that HLSR met its burden to establish that the compensation it pays to individual artists for their performances at the rodeo is a trade secret of HLSR. *See In re Bass*, 113 S.W.3d at 737.

32

## B.     Dolcefino's Need for HLSR's Trade Secrets

HLSR argues that because it established that the fees it pays to individual rodeo performers are trade secrets, the burden shifted to Dolcefino under Rule 507 to present evidence establishing that disclosure of such trade secret information is necessary. *See In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 613 (stating once party asserting trade secret privilege under Rule 507 establishes existence of trade secret, burden shifts to requesting party to "establish that the information is necessary for a fair adjudication of its claims"); *see also In re 4X Indus., LLC*, 639 S.W.3d at 813 (stating burden "requires the requesting party to present evidence") (citing *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 615).  HLSR argues that the trial court erred when it declared that HLSR was not entitled to redact individual performer fees from its disclosures because Dolcefino did not establish a need for the information, and the general public's right to disclosure of a non-profit corporation's records, books, and reports does not trump the non-profit corporation's trade-secret rights. According to HLSR, Dolcefino cannot establish that disclosure of the individual performance fees is necessary because HLSR already disclosed to Dolcefino the total aggregate amount it paid to all performers during a three-year period, thus fulfilling the purpose of Section 22.353 to "expose the nature" of its expenditures. *See In re Bay Area*, 982 S.W.2d at 381 (stating Section 22.353's purpose is to "expose the nature of the expenditures of [the non-profit's] money once received

33

from the public and to make non-profit organizations accountable to their contributors for those expenditures").

In its motion for summary judgment and response to HLSR's summary judgment motion, Dolcefino argued that "[i]n order to hold a nonprofit corporation accountable for [its] expenditures," all financial records "necessary to ensure that accountability must be produced" and "[e]very request submitted by Dolcefino is a request for a record that would hold the Rodeo accountable for [its] expenditures." Similarly, on appeal, Dolcefino argues that disclosure of the fees HLSR pays to individual concert performers is "necessary information for keeping HLSR accountable" to its donors and the communities HLSR purports to serve.

We question whether the Rule 507 burden-shifting analysis applies to matters outside the discovery process, but we need not reach the issue.[20] Even if Dolcefino

---

[20] Authorities that discuss the trade secret privilege under Rule 507 primarily involve discovery disputes in pending litigation. In those cases, to secure disclosure of trade secret information, the requesting party must establish that disclosure of trade secret information is necessary for a fair adjudication of its claims. *See In re Bass*, 113 S.W.3d at 737; *see also In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732 (Tex. 2003) (orig. proceeding) (stating requesting party must prove information is "necessary or essential to the fair adjudication of the case, weighing the requesting party's need for the information against the potential of harm to the resisting party from disclosure"). The parties have not cited, and we have not found, a case involving Rule 507 in the context of a public records request or outside the discovery process. In the trial court, HLSR and Dolcefino both briefed the issue of trade secret disclosure in this matter under Rule 507, and the trial court considered the issue as presented. Because the parties do not dispute the application of Rule 507 to the issue before us, we assume, without deciding, that Rule 507 applies to the present circumstances.

could secure disclosure of the trade secret information involved here under Rule 507 by establishing a need for the information, Dolcefino did not establish that disclosure of HLSR's trade secret information is necessary for any purpose.

Dolcefino did not submit any summary judgment evidence demonstrating that disclosure of the individual amounts HLSR pays to concert performers is necessary for any purpose. *See In re 4X Indus., LLC*, 639 S.W.3d at 810 (stating burden to prove necessity "requires the requesting party to present evidence"). While Dolcefino argued in its response to HLSR's motion for summary judgment that disclosure of all HLSR's financial records is necessary to hold HLSR accountable for its expenditures, Dolcefino's arguments, without more, are not proper summary judgment evidence. *See Clayton v. Wisener*, 169 S.W.3d 682, 684 (Tex. App.—Tyler 2005, no pet.) ("Motions and arguments of counsel are not evidence."); *see also In re Brown*, 277 S.W.3d 474, 485 n.3 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (noting that arguments of counsel are not evidence); *Quanaim v. Frasco Rest. & Catering*, 17 S.W.3d 30, 42 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (stating "neither the motion for summary judgment, nor the response, even if sworn, is ever proper summary judgment proof").

Although HLSR withheld the fees it pays to individual performers from the general ledger it provided to Dolcefino, HLSR included in its disclosed ledger the total aggregate amount it paid to all performers for the relevant three-year period.

The disclosure of this aggregate amount and the reason for the expenditure—performance fees for rodeo concerts—fulfilled the purpose of Section 22.353 to "expose the nature" of a non-profit corporation's expenditures of money received from the public and to "make non-profit organizations accountable to their contributors for those expenditures." *See In re Bay Area*, 982 S.W.2d at 381. Dolcefino did not establish any additional need for disclosure of the fees paid to individual performers.

We hold that to the extent applicable, Dolcefino failed to meet its burden under Rule 507 to establish that disclosure of HLSR's trade secrets was necessary. *See In re Bass*, 113 S.W.3d at 737; *see also In re 4X Indus., LLC*, 639 S.W.3d at 813 (stating burden "requires the requesting party to present evidence") (citing *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 615).

**Disclosure of Trade Secrets Under Section 22.353**

HLSR argues that the trial court erred by declaring that HLSR was not entitled to redact the amount it pays to individual concert performers before making its records, books, and reports available to the public for inspection because the public's "rights of inspection [under Section 22.353] do not trump rights of privilege for non-disclosure." Dolcefino responds that the disclosure requirements of Section 22.353 are absolute and thus a non-profit corporation may not redact information

36

before making its records, books, and annual reports available to the public under Section 22.353.

Citing to *Gaughan v. National Cutting Horse Association*, 351 S.W.3d 408 (Tex. App.—Fort Worth 2011, pet. denied), HLSR argues that Texas courts have protected information based on "the trade secret privilege under the Non-Profit Corporations Act," the predecessor to Section 22.353 of the Texas Business Organizations Code. *See id.* at 418. Dolcefino argues that HLSR's reliance on *Gaughan* is misplaced because the holding of the case is limited to the attorney-client privilege, and if *Gaughan* contains language about "confidential" or "trade secret" information, it is only because the member who requested the records in that case had signed a nondisclosure agreement and hence the court held that "record requests cannot be used to supersede a contract requiring nondisclosure of confidential information."[21] According to Dolcefino, HLSR's "argument that *Gaughan* extends the limitations of [Section] § 22.353 to prevent the disclosure of confidential or trade secret information is disingenuous."

---

[21] To the extent Dolcefino argues that *Gaughan* stands for the proposition that a public records request cannot supersede contractual non-disclosure obligations, an issue we do not reach today, we note that HLSR argues that "[c]ompliance with Dolcefino's inspection request without redacting the individual performance fees could put HLSR at risk of breach of the mutually binding confidentiality provisions in the performance agreements."

No Texas court has addressed whether a non-profit corporation may redact confidential trade secret information from its records, books, and reports prior to disclosure to the public under Section 22.353. Although *Gaughan* and other opinions addressing similar rights to disclosure are factually distinguishable, the general guiding principles espoused in those cases are instructive.

In *Gaughan*, Gaughan, a member in good standing of the non-profit corporation NCHA, requested to inspect NCHA's books and records pursuant to Article 1396–2.23 of the Texas Revised Civil Statutes, which gave the members of a non-profit corporation "the right to examine and copy . . . at any reasonable time, for any proper purpose, the books and records of the corporation relevant to that purpose, at the expense of the member." *See id.* at 414 (quoting TEX. REV. CIV. STAT. art. 1396–2.23 (currently TEX. BUS. ORGS. CODE § 22.351)).[22] NCHA refused to disclose some of the requested records based on its argument that the records were confidential, including records relating to its employees, third-party vendors, and sponsors. Gaughan sued NCHA seeking a judicial declaration that she was entitled to inspect and photocopy the requested records, and she obtained a temporary restraining order prohibiting NCHA from altering or destroying the withheld

---

[22] *See* TEX. BUS. ORGS. CODE § 22.351 ("A member of a corporation, on written demand stating the purpose of the demand, is entitled to examine and copy at the member's expense, in person or by agent, accountant, or attorney, at any reasonable time and for a proper purpose, the books and records of the corporation relevant to that purpose.").

records. *See id.* at 412. NCHA moved to dissolve the TRO and offered to disclose the records to Gaughan subject to a protective order which would prohibit Gaughan from further disclosing the confidential information. The trial court granted NCHA's motion, dissolved the TRO, and issued a protective order allowing NCHA to designate certain records as confidential and prohibiting Gaughan from copying or disclosing the confidential records to others. *See id.*

Gaughan filed a motion for summary judgment arguing that the protective order should be withdrawn because "articles 1396–2.23 and 1396–2.23A of the non-profit corporation act required the NCHA to make its books and records available to members and the general public alike" and thus NCHA is "precluded from designating any of its financial records as confidential." *See id.* She also requested a judicial declaration that "NCHA may not prevent [her] from disclosing to her fellow NCHA members or to other third parties the substance and form of all records reflecting the NCHA's financial activity." *See id.* NCHA counterclaimed against Gaughan seeking a declaration that it had "acted reasonably and in accordance with the law in responding to [Gaughan's] request to review the NCHA documents." *Id.* NCHA cross-moved for summary judgment on its declaratory relief claim arguing, among other things, that even though she had a mechanism to do so, Gaughan "had never challenged the NCHA's designation of any document as confidential" but "instead claimed that no information contained in the documents

39

requested under art. 1396–2.23 could be treated as confidential and that the protective order regarding the documents requested was contrary to law." *Id.* at 413. The trial court granted NCHA's motion for summary judgment, denied Gaughan's motion for summary judgment, and declared that NCHA had designated documents as confidential in accordance with the protective order and that Gaughan had taken no action to contest the designations. *Id.* The trial court thus declared that the records NCHA had designated as confidential pursuant to the protective order were entitled to confidential treatment as a matter of law. *Id.*

On appeal, Gaughan argued that the trial court had erred by entering the protective order and declaring that any of NCHA's records regarding its business transactions with sponsors, vendors, and employees were entitled to confidential treatment under the law. *Id.* at 416. According to Gaughan, article 1396–2.23, "which provides for the inspection rights of a member of a non-profit corporation, is absolute in prohibiting any record from being treated as confidential." *Id.* In rejecting her arguments, the court expressly disagreed with Gaughan's characterization of the statute as absolute and as barring the non-profit corporation from asserting a claim of privilege over the information requested. It held that "[d]ecisions under article 1396–2.23 recognize that the statute is not absolute in its disclosure requirements for members." *Id.* The *Gaughan* court recognized that broader principles revealing that "the scope of the right of inspection for members

40

of a non-profit corporation may be limited by legitimate considerations of privilege, trade secrets, and confidentiality—as well as the differing access granted to members and the public under articles 1396–2.23 and 1396–2.23A, reveals that even members of a non-profit corporation do not have unfettered access to the non-profit's corporate records." *Id.* at 419 n.7.

The court in *Gaughan* relied in part on *Professional Microfilming, Inc. v. Houston*, 661 S.W.2d 767 (Tex. App.—Fort Worth 1983, orig. proceeding), in which the court acknowledged that "the need to protect certain confidential information from dissemination to others may exist *even when* a statutory right to inspection by the shareholder is invoked." *Id.* at 417 (citing *Pro. Microfilming, Inc.*, 661 S.W.2d at 770) (emphasis in original). In *Professional Microfilming*, the trial court issued a discovery order allowing a corporation's shareholder and former director to inspect "PMI's sensitive customer, cost, and pricing information" subject to a protective order which prohibited the shareholder and former director from disclosing any of the contents of those records to third parties. *Id.* at 417 (citing *Pro. Microfilming, Inc.*, 661 S.W.2d at 768–69). The court of appeals denied Professional Microfilming's petition for writ of mandamus in part because the trial court had taken adequate measures to protect the confidentiality of the information, stating:

> Judge Houston's discovery order adequately considered the sensitivity of the requested data, and the potential for misuse of that data by Hightower and Eikon. Judge Houston's order enjoined Hightower from disclosing the information or using it for purposes other than those

41

> connected with the litigation. The order also provided that the documents requested to be produced be sealed in envelopes and filed with the court, to be opened only by order of the court. Judge Houston thus set up a procedure which would allow him to examine each document before disclosing it to Hightower, and impose even greater restrictions than the initial injunction if necessary.

*Pro. Microfilming, Inc.*, 661 S.W.2d at 770.

Relying on *Huie v. DeShazo*, 922 S.W.2d 920 (Tex. 1996), the *Gaughan* court also held that "a member's own right to inspect and copy books and records under article 1396–2.23 does not trump privileges or other rights to confidentiality provided for by Texas law." *Gaughan*, 351 S.W.3d at 418. In *Huie*, the Texas Supreme Court rejected a trust beneficiary's argument that the trustee's "fiduciary duty of disclosure overrides any attorney-client privilege that might otherwise apply." *Huie*, 922 S.W.2d at 923. In doing so, the court also disapproved of a lower court's holding that a member's statutory right of inspection of the non-profit corporation's records "somehow trumped the privilege for confidential attorney-client communications." *Id.* at 924.

Although *Huie* and the other opinions the *Gaughan* court cited address the attorney-client privilege, we see no reason why trade secret information would not entitled to the same level of protection, especially when the party seeking disclosure of the trade secret information is an unaffiliated third party, as opposed to a member of the non-profit corporation. As it concerns a trade secret, "the right to exclude others is central to the very definition of the property interest." *Ruckelshaus v.*

*Monsanto Co.*, 467 U.S. 986, 1011 (1984). Once trade secret information is "disclosed to others, or others are allowed to use [the information], the holder of the trade secret has lost his property interest in the [information]." *Id.*; *see generally Oryon Techs., Inc. v. Marcus*, 429 S.W.3d 762, 764 (Tex. App.—Dallas 2014, no pet.) (recognizing information loses its trade secret status when information becomes known to general public). Thus, "public disclosure of trade secrets should not be required . . . except 'in such cases and to such extent as may appear to be indispensable for the ascertainment of truth.'" *Automatic Drilling Machs., Inc. v. Miller*, 515 S.W.2d 256, 259 (Tex. 1974) (quoting 8 WIGMORE, EVIDENCE § 2212(3) (McNaughton rev. 1961)); *Oryon Techs., Inc.*, 429 S.W.3d at 765 (stating "trial court may only order the public disclosure of trade secrets if such disclosure is 'indispensable to truth and justice'") (quoting *In re Samsung Telecomms. of Am., Inc.*, No. 05-99-01949-CV, 1999 WL 1081387, at *2 (Tex. App.—Dallas Dec. 2, 1999, no pet.)).

Dolcefino has not directed this Court to any authority undermining this conclusion. As HLSR points out, members of a non-profit corporation have greater rights of inspection than members of the public who only have a right to inspect and copy the non-profit corporation's financial records. *See Gaughan*, 351 S.W.3d at 414–15. If the statutory right of a non-profit corporation's member to inspect the corporation's records may be limited by legitimate considerations of privilege, trade

secrets, and confidentiality, as *Gaughan* held, then surely the public's statutory right to inspect a non-profit corporation's financial records may be limited as well. We thus hold that under Section 22.353, HLSR is entitled to redact from its general ledger and withhold from public disclosure the compensation it pays to artists individually for their performances at the rodeo, information that based on the summary judgment record, constitutes a trade secret as a matter of law.

In light of HLSR's substantial property interests in protecting its trade secret information, which effectively would be destroyed by public disclosure of the fees it pays to individual concert performers, HLSR's disclosure of the total aggregate amount it paid concert performers during the relevant time period thus fulfilling the purpose of Section 22.353, and Dolcefino's failure to present any evidence establishing that disclosure of such trade secret information is necessary for any purpose, even if required, we hold the trial court erred by declaring that HLSR is not entitled to redact the fees it pays to individual concert performers from its general ledger before making its records, books, and reports available to the public for inspection under Section 22.353 and ordering HLSR to disclose such information to Dolcefino for public inspection. The trial court further erred by denying HLSR's motion for summary judgment seeking declarations that HLSR "established that the performer fees constitute trade secrets" and that HLSR "is entitled to redact [performer expenditures] from the general ledgers before public inspection,"

44

granting Dolcefino's cross-motion for summary on that issue, and declaring that HLSR "failed to establish that the performer fees are a trade secret and not subject to public inspection pursuant to Tex. Bus. Orgs. Code § 22.353" and thus is "not entitled to redact performer expenditures" from its general ledger.

We thus reverse the portion of the trial court's judgment denying HLSR's motion for summary judgment on this issue and granting Dolcefino's cross motion for summary judgment on the same issue, and we declare that HLSR established that the compensation it pays to artists individually for their performances at the rodeo constitutes a trade secret that HLSR may redact from its general ledger before public inspection under Section 22.353. *See Sw. Bell Tel. L.P.*, 459 S.W.3d at 583 (stating when trial court rules on competing summary judgment motions, grants one motion and denies other, appellate courts consider all summary judgment evidence, "determine all questions presented, and if trial court erred, render the judgment the trial court should have rendered").

**Conclusion**

Because we reverse the portion of the trial court's judgment declaring that HLSR failed to establish that the amount it pays to individual concert performers is a trade secret and that HLSR cannot redact that information from its general ledger before making its records available for inspection to the public under Section 22.353, we also reverse the award of attorney's fees to Dolcefino and remand the cause for

45

the trial court to determine what award of attorney's fees to any party, if any, is "equitable and just" in light of our holding. *Bd. of Med. Exam'rs v. Nzedu*, 228 S.W.3d 264, 276 (Tex. App.—Austin 2007, pet. denied); *see also Gore v. Scot. Golf, Inc.*, No. 04-03-00143-CV, 2003 WL 22238916, at *4 (Tex. App.—San Antonio Oct. 1, 2003, no pet.) (mem. op.) (reversing attorney's fees award to enable trial court to reconsider fees on remand where trial court's order granting relief was reversed).

Veronica Rivas-Molloy
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.